IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

| | |
|---|---|
| DYNO NOBEL, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>BOB JOHNSON, an individual,<br><br>Defendant. | ORDER AND MEMORANDUM DECISION<br><br>Case No. 2:20-CV-00840<br><br>Judge Tena Campbell |

Defendant Bob Johnson moves to dismiss this action for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure. In the alternative, he moves to transfer venue from the District of Utah to the Middle District of Tennessee under 28 U.S.C. § 1404. Plaintiff Dyno Nobel, Inc. (Dyno) opposes both of Mr. Johnson's requests.

For the reasons set forth below, the court denies Mr. Johnson's motion. (ECF No. 6). The court finds that it can exercise personal jurisdiction over Mr. Johnson and that a venue transfer is not warranted.

**FACTUAL BACKGROUND**[1]

**I.     Mr. Johnson's Employment Agreement with Dyno**

---

[1] Relevant facts are taken from the complaint and from affidavits submitted in support of Mr. Johnson's motion and Dyno's opposition. The facts are taken as true for the purposes of this order. See Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d 1063, 1070 (10th Cir. 2008); Blueberry Hill LLC v. Shalom Int'l Corp., No. 2:17-CV-00385-DS, 2017 WL 5508347, at *1 (D. Utah Nov. 15, 2017).

1

Dyno is a commercial explosives company incorporated in Delaware with its principal place of business in Utah. (Compl. ¶ 1.) Dyno's headquarters are located in Salt Lake City. On April 12, 2018, Mr. Johnson began working for Dyno as a Director of Joint Venture and Independent Distributors. (Id. ¶ 7.) In this role, Mr. Johnson—who was based in Frankfort, Illinois and Louisville, Kentucky—was responsible for managing Dyno's commercial relationships with several other companies. (Id.) These distributors included Warex, Inc. (Warex), an Indiana corporation, and Brandywine Explosives and Supply, Inc. (Brandywine), a Kentucky corporation. (Id.)

Mr. Johnson executed an Employment Agreement with Dyno (the Agreement) when he began his job. The parties agreed that disputes related to the Agreement would be subject to Utah law, although the Agreement does not have a forum selection clause. (Id. ¶ 18.)

The Agreement contains confidentiality and loyalty provisions meant to prevent Mr. Johnson from disclosing Dyno trade secrets and from working for other companies while employed by Dyno. (Id. ¶¶ 14–15.) The Agreement also includes a non-compete provision, which prohibits Mr. Johnson from working for any of Dyno's competitors for one year after the termination of his employment from Dyno. (Id. ¶ 16.) The Agreement's non-solicitation provision forbids Mr. Johnson from soliciting business from Dyno customers for one year after the termination of his employment. (Id. ¶ 17.)

Dyno bases its lawsuit on allegations that Mr. Johnson was "moonlighting"—performing work on the side—for Warex in violation of the Agreement. (Id. ¶¶ 19–25.) Dyno specifically claims that Mr. Johnson secretly worked with principals from Warex and Brandywine to form a new venture, called BEX, that would divert customers away from Dyno. (Droubay Decl. ¶ 18.)

On November 5, 2020, Dyno asked Mr. Johnson if he was moonlighting for Warex, and Mr. Johnson denied the allegations. (Compl. ¶ 23; Droubay Decl. ¶ 12 (ECF No. 8-1).)

The next day, Mr. Johnson resigned from his position with Dyno. (Compl. ¶ 26.) He told his former Dyno supervisor that he intended to begin employment with Warex. Dyno reminded Mr. Johnson of his obligations under the Employment Agreement, and although Mr. Johnson asked to be released from the non-compete provision, Dyno did not release him (Id. ¶¶ 27–29.)

## II.   Mr. Johnson's Connections to Utah

Mr. Johnson currently lives in Nashville, Tennessee. (Johnson Decl. ¶ 3 (ECF No. 6-1).) Before he moved to Nashville in August of 2020, Mr. Johnson lived in Kentucky and Chicago, Illinois. He has never lived, owned property, paid taxes, or advertised in Utah. (Id. ¶¶ 5–10.) He has no family in Utah.

When he worked for Dyno, Mr. Johnson primarily interacted with Warex and Brandywine in Indiana and Kentucky. (Id. ¶ 16.) He also worked with two companies in Iowa. He never interacted with Dyno customers in Utah. (Id. ¶ 17.)

Mr. Johnson's direct supervisor at Dyno was Steve Salter, who lives in Utah and works from Dyno's Salt Lake City headquarters. (Salter Decl. ¶¶ 3, 4 (ECF No. 8-2).) There were no intermediaries between Mr. Johnson and Mr. Salter.[2] Mr. Johnson spoke with Mr. Salter on the telephone at least once a week, and they emailed each other more frequently. Sometimes they spoke on the phone every day. (Id. ¶ 6.)

---

[2] The parties disagree about whether Mr. Salter was Mr. Johnson's sole and direct supervisor. Mr. Johnson states that he "principally communicated with Dyno managers and employees located in [his] region, not in Utah." (Johnson Decl. ¶ 15.) Because this is a 12(b)(2) motion to dismiss, this factual dispute is resolved in Dyno's favor, and the court takes as true the fact that Mr. Johnson reported directly to Mr. Salter.

According to Mr. Salter, Mr. Johnson traveled to Utah on at least five occasions during his employment. (Id. ¶ 12.) He visited Utah when he was initially hired, brought a customer to Utah to tour Dyno's truck shop, and came to Utah to attend management training meetings.[3] (Id. ¶¶ 13–15.)

Every month Mr. Johnson participated on a forecasting videoconference call initiated from Dyno's Utah headquarters. (Id. ¶ 7.) Additionally, Mr. Johnson put together price lists for his distributors and customers, who would then submit orders to Dyno's Utah headquarters based on those price lists. (Id. ¶ 8–9.)

Mr. Johnson made business purchases on a company card that was connected to Dyno's Utah headquarters. (Id. ¶ 9.) He also used a company vehicle, company phone, and company computer that were paid for from Utah.

## LEGAL STANDARD

The plaintiff bears the burden of establishing personal jurisdiction over a defendant. Shrader v. Biddinger, 633 F. 3d 1235, 1239 (10th Cir. 2011). When responding to a Rule 12(b)(2) motion to dismiss, a plaintiff need only make a prima facie showing of personal jurisdiction through the submission of affidavits or other written materials facts. Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F. 3d 1063, 1070 (10th Cir. 2008). Allegations in the complaint are taken as true if they are "plausible, non-conclusory, and non-speculative" Id. When a defendant submits evidence to challenge personal jurisdiction, the plaintiff has a duty to come forward with evidence supporting the jurisdictional allegations in the complaint. Pytlik v. Professional Resources, Ltd., 887 F. 2d 1371, 1376 (10th Cir. 1989). Factual disputes in the

---

[3] The parties also dispute how many times Mr. Johnson traveled to Utah during his employment. Mr. Johnson says that he only traveled to Utah twice while employed by Dyno. (See Johnson Decl. ¶ 11.) At this stage in the proceedings, this factual dispute is resolved in Dyno's favor.

affidavits are resolved in the plaintiff's favor. Dudnikov, 514 F. 3d at 1070 (citing FDIC v. Oaklawn Apartments, 959 F.2d 170, 174 (10th Cir.1992)).

## ANALYSIS

Dyno filed its complaint in the District of Utah, bringing six causes of action against Mr. Johnson: breach of contract, breach of implied covenant of good faith and fair dealing, breach of fiduciary duty, fraud, conversion, and tortious interference with economic relations. (See Compl.) Mr. Johnson argues that personal jurisdiction in the District of Utah is improper because Mr. Johnson does not have sufficient minimum contacts with Utah and because the events giving rise to this dispute occurred outside of Utah. Even if this court can exercise personal jurisdiction, Mr. Johnson asks the court to transfer venue to the Middle District of Tennessee for the convenience of the parties and witnesses.

### I.    Personal Jurisdiction

"To obtain personal jurisdiction over a nonresident defendant in a diversity action, a plaintiff must show that jurisdiction is legitimate under the laws of the forum state and that the exercise of jurisdiction does not offend the due process clause of the Fourteenth Amendment." TH Agric. & Nutrition, LLC v. Ace European Grp. Ltd., 488 F.3d 1282, 1286–87 (10th Cir. 2007) (internal quotation marks omitted). The Utah long-arm statute authorizes jurisdiction to the full extent permitted by the United States Constitution. Utah Code § 78B-3-201(3). Accordingly, the court need only evaluate whether the exercise of personal jurisdiction over defendants comports with constitutional due process. Kuenzle v. HTM Sport–Und Freizeitgerate AG, 102 F.3d 453, 455 (10th Cir.1996).

"The Supreme Court has held that, to exercise jurisdiction in harmony with due process, defendants must have 'minimum contacts' with the forum state, such that having to defend a

lawsuit there would not 'offend traditional notions of fair play and substantial justice.'" Dudnikov, 514 F.3d at 1070 (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)). A defendant's contacts with the forum state may give rise to either general or specific personal jurisdiction. Here, neither party contends that there is general personal jurisdiction over Mr. Johnson in the District of Utah. The court's only inquiry is whether Mr. Johnson is subject to specific personal jurisdiction.

Specific jurisdiction requires a two-step analysis. First, the court evaluates whether the plaintiff has shown that the defendant has sufficient minimum contacts with the forum state. Dudnikov, 514 F.3d at 1070. If so, the court then determines whether the exercise of personal jurisdiction complies with traditional notions of fair play and substantial justice— in other words, whether personal jurisdiction is fair and reasonable. Id.

### A. Minimum Contacts

The Tenth Circuit uses slightly different tests to assess minimum contacts for claims based in contract versus claims based in tort. "In the tort context, we often ask whether the nonresident defendant purposefully directed its activities at the forum state; in contract cases, meanwhile, we sometimes ask whether the defendant purposefully availed itself of the privilege of conducting activities or consummating a transaction in the forum state." Id. at 1071 (internal quotations omitted). Nevertheless, these tests have a shared goal, which is to ensure that an out-of-state defendant is not bound to appear in a forum state for merely "random, fortuitous, or attenuated contacts" with the state. Id. (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985)). In both situations, due process requires the court to consider whether plaintiffs' injuries "arise out of" defendants' contacts with the forum jurisdiction. Many courts have

6

interpreted this language to require some sort of causal connection between a defendant's contacts and the suit at issue.

Dyno raises both contract and tort causes of action against Mr. Johnson, and the parties analyze the contract and tort claims separately in their discussion of minimum contacts. But, as Dyno notes, the doctrine of pendent personal jurisdiction allows the court to exercise jurisdiction over the tort claims so long as it has an independent basis for jurisdiction over the contract claims. United States v. Botefuhr, 309 F.3d 1263, 1272 (10th Cir. 2002) ("In essence, once a district court has personal jurisdiction over a defendant for one claim, it may "piggyback" onto that claim other claims over which it lacks independent personal jurisdiction, provided that all the claims arise from the same facts as the claim over which it has proper personal jurisdiction.")

Both Dyno's contract and tort claims arise from the same nucleus of operative facts: Mr. Johnson allegedly moonlighted for Warex, formed a competing company while still employed by Dyno, and solicited Dyno customers—all in violation of the Employment Agreement. Because the court finds that it has jurisdiction over Dyno's contract claims, it does not analyze whether it also has an independent basis for personal jurisdiction over the tort claims.

### 1. Purposeful Availment

To have sufficient minimum contacts with a forum state, a defendant must have purposefully availed himself of the protections or privileges of the state's laws such that he "should reasonably anticipate being haled into court there." Burger King, 471 U.S. at 473–72. "Purposeful availment requires actions by [the defendant] which create a substantial connection with the forum state. . . we must examine the quantity and quality of [the defendant's] contacts with the forum state." Employers Mutual Casualty Co. v. Bartile Roofs, Inc., 618 F.3d 1153, 1160 (10th Cir. 2010).

Contracts alone are usually insufficient to establish minimum contacts. But parties who reach out from one state to "create continuing relationships and obligations with citizens of another state" can expect to be sued in that other state as the consequence of their activities. Marcus Food Co. v. DiPanfilo, 671 F.3d 1159, 1166 (10th Cir. 2011) (citing TH Agric., 488 F.3d at 1287–88)); see also Burger King, 471 U.S. at 480 (upholding jurisdiction over defendants who reached out into the forum state by entering a contractual relationship that envisioned "continuing and wide-reaching contacts" there.) In its analysis, the court must examine the parties' "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." TH Agric., 488 F.3d at 1278–88.

In Marcus Food Co. v. DiPanifilo, the defendant—a Canadian citizen—had entered into an oral agreement to serve as an independent agent for the plaintiff, a Kansas company. 671 F.3d at 1164. The court found that the defendant had sufficient minimum contacts with Kansas because he communicated with the plaintiff at its Kansas headquarters on a monthly basis, received reimbursements from the Kansas headquarters, and traveled to Kansas on two occasions as a result of his relationship with the plaintiff. Id. at 1667–68. According to the Tenth Circuit, "[t]he parties' agreement created precisely the type of 'continuing relationship' on which the Supreme Court grounded personal jurisdiction in Burger King Corp. v. Rudzewicz, 471 U.S. 462, 473, 478, 486." Id. at 1167.

Similarly, in Equifax Services, Inc. v. Hitz, 905 F.2d 1355 (10th Cir. 1990), the Tenth Circuit found sufficient minimum contacts between a California defendant and the forum state of Kansas. The defendant was the plaintiff's former employee and had entered into an employment contract subject to Kansas law. The defendant made two trips to Kansas during his employment, reported directly to supervisors in Kansas, consistently communicated by telephone, mail, and

8

email with employees in Kansas, and received reimbursements from the plaintiff's Kansas office. These contacts indicated "purposeful affiliation with the forum through an interstate contractual relationship" and were sufficient to establish personal jurisdiction. Id. at 1359.

Like the defendants in Marcus Food and Equifax, Mr. Johnson had a deliberate and continuous relationship with Utah while he was employed by Dyno for over two years. He communicated frequently with his supervisor who was located at Dyno's Utah headquarters. He visited Utah five times on work-related trips and received various benefits and reimbursements from the Utah office. He participated on monthly videoconference calls with employees in Utah and worked with customers who submitted orders to Utah.

Mr. Johnson's connections to Utah reinforce the "interstate character" of his work. Equifax Services, 905 F.2d at 1359. Mr. Johnson's Agreement with Dyno is governed by Utah law, which supports Mr. Johnson's "deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there." Burger King, 471 U.S. at 482.

Mr. Johnson tries to distinguish the facts of Marcus Foods and Equifax from his situation. He also emphasizes that Marcus Foods and Equifax were decided before the Supreme Court handed down its decision in Walden v. Fiore, 571 U.S. 277 (2014). He argues that Walden precludes this court from exercising personal jurisdiction.

Mr. Johnson's assertions are unconvincing. The factual differences that Mr. Johnson highlights are minimal, while the similarities between the present case and Marcus Food and Equifax are abundant and compelling.  Likewise, Mr. Johnson's application of Walden is misplaced. In Walden, Nevada citizens brought a Bivens action in federal court in Nevada against a police officer who allegedly violated their Fourth Amendment rights when they traveled through an airport in Georgia. 571 U.S. at 281. All of the conduct giving rise to the

lawsuit had occurred in Georgia, and the police officer had never traveled to, conducted activities within, or contacted anyone in Nevada. The Supreme Court concluded that the police officer lacked minimum contacts with Nevada and overturned the Court of Appeal's analysis, which improperly focused on the plaintiffs' contacts as opposed to the defendant's. The proper evaluation, the Court explained, is whether the defendant's conduct "connects him to the forum in a meaningful way." Id. at 290.

Mr. Johnson argues that his relationship with Dyno Nobel is his only connection to Utah, and under Walden this relationship is insufficient to support jurisdiction. But unlike the defendant in Walden, Mr. Johnson's employment by Dyno created a considerable and meaningful connection between Mr. Johnson and Utah. Mr. Johnson agreed to employed by a Utah-based company, through which he received training, a salary, consistent supervision, business expense reimbursements, a car, a phone, and a computer—all of which came from Utah. Mr. Johnson also agreed that disputes arising from his employment contract would be subject to Utah law. Mr. Johnson's relationship to Utah is far more extensive than the Walden defendant's relationship to Nevada.

For these reasons, it is clear that Mr. Johnson purposefully availed himself of Utah's privileges and could reasonably anticipate being brought into court in Utah.

### 2.      "Arising Out Of"

It is uncontested that Dyno's alleged injuries arise from Mr. Johnson's contacts in Utah. If not for Mr. Johnson's Utah connections—his employment with Dyno, the Agreement, his relationship with Mr. Salter, and his business activities connected to Dyno's headquarters— Dyno would not have a lawsuit to bring against Mr. Johnson.

### B.      Fairness Factors

At the second step of the specific jurisdiction analysis, the court considers five factors in deciding whether the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice. See World–Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292, (1980) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)). The factors are:

(1) the burden on the defendant,

(2) the forum state's interests in resolving the dispute,

(3) the plaintiff's interest in receiving convenient and effectual relief,

(4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and

(5) the shared interest of the several states or foreign nations in furthering fundamental social policies.

Marcus Food, 671 F.3d at 1167.

Here, only the first factor—the burden on the defendant—weighs in favor of Mr. Johnson. Nashville is far from Salt Lake City, and Mr. Johnson will likely have travel over 1,600 miles to litigate this action. On the other hand, the remaining factors either favor Dyno, are neutral, or are inapplicable. Utah, like all states, has an "important interest in providing a forum in which their residents can seek redress for injuries caused by out-of-state actors," and "the state's interest is also implicated where resolution of the dispute requires a general application of the forum state's laws." Benton v. Cameco Corp., 375 F.3d 1070, 1079 (10th Cir. 2004). Dyno has an interest in receiving relief in Utah because it chose to litigate in this forum. The fourth factor is neutral, and the fifth factor does not apply.

For these reasons, this court's exercise of personal jurisdiction over Mr. Johnson is reasonable and fair. Dyno has met its burden to show that jurisdiction in the District of Utah is proper.

## II.     Transfer under 28 U.S.C. § 1404(a)

Even though personal jurisdiction exists in the District of Utah, Mr. Johnson requests that this action be transferred to the Middle District of Tennessee. Under 28 U.S.C. § 1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." The decision whether to transfer an action is within the discretion of the trial court. Wm. A. Smith Contracting Co., Inc. v. Travelers Indem. Co., 467 F.2d 662, 664 (10th Cir. 1972).

As the party seeking a change of venue, Mr. Johnson "bears the burden of establishing that the existing forum is inconvenient." Chrysler Credit Corp. v. Country Chrysler, Inc., 928 F.2d 1509, 1515 (10th Cir. 1991). "Merely shifting the inconvenience from one side to the other, however, obviously is not a permissible justification for a change of venue." Scheidt v. Klein, 956 F.2d 963, 966 (10th Cir.1992) In assessing whether the existing forum is inconvenient, courts weigh the following factors:

> The plaintiff's choice of forum; the accessibility of witnesses and other sources of proof, including the availability of compulsory process to insure attendance of witnesses; the cost of making the necessary proof; questions as to the enforceability of a judgment if one is obtained; relative advantages and obstacles to a fair trial; difficulties that may arise from congested dockets; the possibility of the existence of questions arising in the area of conflict of laws; the advantage of having a local court determine questions of local law; and[ ] all other considerations of a practical nature that make a trial easy, expeditious and economical.

Employers Mutual, 618 F.3d at 1167 (internal quotations omitted). As described below, an analysis of the factors demonstrates that the District of Utah is as convenient as the Middle District of Tennessee.

### A.  Plaintiff's Choice of Forum

"Unless the balance is strongly in favor of the movant[,] the plaintiff's choice of forum should rarely be disturbed." Id. at 1167–68. On the other hand, courts "give little weight" to a plaintiff's choice of forum "where the facts giving rise to the lawsuit have no material relation or significant connection to the plaintiff's chosen forum." Id. (quoting Cook v. Atchison, Topeka & Santa Fe Ry. Co., 816 F.Supp. 667, 669 (D.Kan.1993)).

Here, the balance of factors does not weigh strongly in favor of a transfer, and as a result Dyno's choice to sue Mr. Johnson in the District of Utah must be respected. The court disagrees with Mr. Johnson that the majority of facts giving rise to this action have no material relation or significant connection to Utah. On the contrary, Mr. Johnson agreed to work for a Utah corporation, entered into an Employment Agreement governed by Utah law, and reported to Mr. Salter in Utah. See F.H.G. Corp. v. Green Wave, Inc., No. 1:16–cv–00147–JNP, 2017 WL 2728412, at *5 (D. Utah Jun. 23, 2017) ("[T]he inquiry at this stage is not whether some other forum has a greater material relation or significant connection—it is whether this particular forum has at least some 'material relation or significant connection' to the 'facts giving rise to the lawsuit.'" (quoting Employers Mutual, 618 F.3d at 1168)). Although Mr. Johnson's alleged breach of the Employment Agreement occurred outside of Utah, this does not detract from Utah's connection to the facts underlying Dyno's claims. See Butikofer v. Nygren, No. 2:16–cv–00610–DN, 2016 WL 7190556, at *4 (D. Utah Dec. 12, 2016). Because Dyno's choice of forum is afforded great weight, this factor heavily favors Dyno.

### B. Accessibility of Witnesses

The accessibility and convenience of witnesses is "the most important factor in deciding a motion under §1404(a)." Employers Mutual, 618 F.3d at 1169. To show that the forum court is inconvenient, the movant must "(1) identify the witnesses and their locations; (2) 'indicate the quality or materiality of the[ir] testimony'; and (3) 'show[ ] that any such witnesses were unwilling to come to trial . . . [,] that deposition testimony would be unsatisfactory[,] or that the use of compulsory process would be necessary.'" Id. (quoting Scheidt, 956 F.2d at 966 (brackets omitted) (internal quotation marks omitted); see also 15 Charles A. Wright, Arthur R. Miller, Edward H. Cooper & Catherine T. Struve, Federal Practice and Procedure Wright, § 3851, at 227–28 (4th ed. 2008) ("If the moving party merely has made a general allegation that necessary witnesses are located in the transferee forum, ... the application for transferring the case should be denied....").

Mr. Johnson describes two witnesses, besides himself, who live in Tennessee: Travis Martzall, Dyno's General Manager, and an unidentified sales manager employed by Hermitage Explosives. The other witnesses Mr. Johnson identifies, Todd Wallwork of Warex and Tom McMahan of Brandywine, line in Evansville, Indiana, and Paris, Kentucky, respectively. And at least two other witnesses, Steve Salter and John Droubay, live in Utah.

If two witnesses live in Tennessee, two live in Utah, and the rest live somewhere in the middle, then the forums are equally convenient. The court is not persuaded by Mr. Johnson's argument that it is decisively more convenient for the Indiana and Kentucky witnesses to travel to Tennessee than to Utah—either way, a flight or long car ride is likely required. And, to the extent the Indiana and Kentucky witnesses are beyond the 100-mile radius of the District of

Utah's subpoena power, they also are beyond the subpoena power of the Middle District of Tennessee.[4]

Moreover, Mr. Johnson has not provided any declarations from witnesses stating that they would be unable or unwilling to travel to Utah. Compare Rodriguez-Cayro v. Rodriguez-Cayro, No. 217CV01197HCNPMW, 2019 WL 4917066, at *4 (D. Utah Oct. 4, 2019) (granting transfer where the defendant sufficiently detailed the significance of his witnesses' anticipated testimony and provided declarations from most witnesses stating they would be unwilling to travel to the forum state). Tennessee and Utah are equally convenient forums for the witnesses, so this factor is neutral.

        **C.**     **Cost of Making Necessary Proof**

The cost of litigating this case in Utah is not significantly more than it would be in Tennessee. Unlike in Star Stone Quarries, Inc. v. Garland, where "almost all of the evidence and witnesses for trial" were located in the transferee state, the witnesses in this case are spread out equally among and between Utah and Tennessee. 300 F. Supp. 2d 1177, 1182 (D. Utah 2003). Likewise, Mr. Johnson does not mention any evidence in Tennessee that does not also exist in Utah. The cost of depositions would likely be the same in either forum because depositions are often conducted virtually. This factor is neutral.

        **D.**     **Enforceability of Judgment**

Dyno requests injunctive relief, including an order requiring "Johnson to immediately terminate working for Warex, and prohibiting him from working for any competitor of Dyno…" (Compl. at 18.) Any injunction awarded against Mr. Johnson would be more easily enforced

---

[4] Evansville, Indiana, is located 150 miles from Nashville and Paris, Kentucky, is located 230 miles from Nashville.

from Tennessee, where he lives and works. Still, "a judgment issued in [the District of Utah] is enforceable in any district in the country." Cmty. Television of Utah, LLC v. Aereo, Inc., 997 F. Supp. 2d 1191, 1207 (D. Utah 2014). As such, this factor weighs only slightly in Mr. Johnson's favor.

### E.  Advantages and Obstacles to a Fair Trial

Mr. Johnson says that if this case is not transferred it is "a virtual certainty" that third-party witnesses will only be heard through deposition testimony, which would be "unfair." (Def.'s Mot. at 22–23.) But again, Mr. Johnson has not provided any evidence that the prospective third-party witnesses in this case are unable or unwilling to travel to Utah. There is no indication that a trial held in Utah would be less fair than a trial held in Tennessee in any other respect. This factor is neutral.

### F.  Difficulties Arising from Congested Dockets

Mr. Johnson provides statistics from the District of Utah and the Middle District of Tennessee about median time from filing to disposition in each court, the median time from filing to trial in each court, the number of pending cases per judge in each court, and the average weighted filings per judge. But the difference in statistics between the two courts is negligible. For example, the average number of months from filing to disposition was 10.4 months in Utah versus 10.3 months in Tennessee as of September 30, 2020. (See Def.'s Mot. at 23.) Consequently, this factor is neutral.

### G.  Conflicts of Laws & Advantage of Local Courts Determining Local

"In a diversity action, courts prefer the action to be adjudicated by a court sitting in the state that provides the governing substantive law." Employers Mutual, 618 F.3d at 1170. Yet this factor receives less weight when the case involves "relatively simple" legal issues. Id.

There is little question that the Employment Agreement, from which Dyno's breach of contract claims arise, is governed by Utah law. The more complicated issue is which state's law governs Dyno's tort claims.

To figure this out, the presiding court must apply its own state's choice of law rules. Utah and Tennessee both apply the "most significant relationship" approach for tort claims, as described in the Restatement (Second) of Conflict of Laws. Hataway v. McKinley, 830 S.W.2d 53, 59–60 (Tenn. 1992); Waddoups v. Amalgamated Sugar Co., 54 P.3d 1054, 1059 (Utah 2002). This approach provides that the rights and liabilities of the parties to an action in tort are determined by the local law of the state that has the most significant relationship to the incident and the parties involved.

Although the court refrains from performing a full choice-of-law analysis in this order, it seems likely that Tennessee law will govern Dyno's tort claims under the most significant relationship approach. Consequently, if this case remains in Utah, this court will apply Utah law to the contract claims and Tennessee law to the tort claims. The same would be true if this case were to be transferred to the Middle District of Tennessee. On the whole, this factor is neutral.

Finally, "when the merits of an action are unique to a particular locale, courts favor adjudication by a court sitting in that locale." Id. at 1170. This case does not involve issues that are unique to Utah or Tennessee.

In sum, the balance of factors weighs against transferring this case. Dyno's choice of forum heavily favors keeping this case in the District of Utah, and only one factor—enforceability of the judgment— tilts slightly in Mr. Johnson's favor. All of the remaining factors are neutral, and a venue transfer would merely shift the inconvenience from Mr. Johnson to Dyno. Accordingly, Mr. Johnson's request to transfer venue is denied.

## **ORDER**

For the reasons stated, Mr. Johnson's motion to dismiss for lack of personal jurisdiction or, in the alternative, to transfer venue (ECF No. 6) is DENIED.

DATED this 27th day of April, 2021.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
U.S. District Court Judge